FILED
U.S. DISTRICT COURT
BRUNSWICK DIV.

2007 JAN -8  P 2: 49

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF GEORGIA
### WAYCROSS DIVISION

JOHN BURNETTE, father of decedent  )
JOHN ROBERT BURNETTE,              )
                                   )
                    Plaintiff,     )
                                   )
         v.                        )       CIVIL ACTION NO.: CV505-063
                                   )
MILTON SHANE TAYLOR,               )
DAVID A. BATTON,                   )
ROBERT EUGENE WATERS,              )
and MICHAEL A. JOHNSTON,           )
individually and in their capacities as )
Deputy Sheriffs of Bacon County,   )
Georgia,                           )
                                   )
                    Defendants.    )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, the father of an individual who died while being detained at the Bacon County Jail, filed an action pursuant to 42 U.S.C. § 1983. Defendants Taylor, Batton, Waters, and Johnston ("Defendants") filed a Motion for Summary Judgment. Plaintiff filed a Response. Defendants filed a Reply, to which Plaintiff responded. For the following reasons, Defendants' Motion for Summary Judgment should be **GRANTED**, in part, and **DENIED**, in part.

## STATEMENT OF THE CASE

Plaintiff contends that his son, John Robert Burnette ("Buster"), died from a drug overdose while he was housed at the Bacon County Jail. Plaintiff asserts that Defendants knew that Buster was under the influence of drugs and that Defendants failed to provide

AO 72A
(Rev. 8/82)

Buster with medical care or to even properly monitor him. Plaintiff avers that the Defendants' failure to provide his son with medical care violated Buster's rights guaranteed by the Eighth and Fourteenth Amendments.

Defendants aver that Plaintiff's claims fail to allege any constitutional violations by them. Defendants assert that they did not know, nor did they have reason to believe, that Buster ingested a lethal dose of narcotics. Defendants also assert that they are entitled to summary judgment in their official capacities, as Plaintiff can present no evidence of a policy or custom being "the moving force" behind any alleged constitutional violations. (Doc. No. 45, p. 21.)

## STANDARD OF DETERMINATION

Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving part[ies are] entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1223 (11th Cir. 2004). An issue of fact is "material" if it might affect the outcome of the case, and an issue of fact is "genuine" when it could cause a rational trier of fact to find in favor of the nonmoving party. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259-60 (11th Cir. 2004). The court must determine "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Id. at 1260 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

2

AO 72A
(Rev. 8/82)

The moving parties bear the burden of establishing that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving parties must identify the portions of the record which establish that there are no genuine issues of material fact. Hickson, 357 F.3d at 1260 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). When the nonmoving party would have the burden of proof at trial, the moving parties may discharge their burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. Id. In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Acevado v. First Nat'l Bank, 357 F. 3d 1244, 1247 (11th Cir. 2004).

## DISCUSSION AND CITATION OF AUTHORITY

I.  **Defendants are not Entitled to Summary Judgment on Plaintiff's Deliberate Indifference Claims.**

The Eighth Amendment's proscription against cruel and unusual punishment imposes a constitutional duty upon prison officials to take reasonable measures to guarantee the safety of prison inmates. "To show a violation of [his] Eighth Amendment rights, [a p]laintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Purcell ex rel. Estate of Morgan v. Toombs County, Ga., 400 F.3d 1313, 1319 (11th Cir. 2005). "To be deliberately indifferent a prison official must know of and disregard 'an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference

3

could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Id. at 1319-20 (quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979, 128 L. Ed. 2d 811 (1994)). Whether a substantial risk of serious harm exists so that the Eighth Amendment might be violated involves a legal rule that takes form through its application to facts. For summary judgment purposes, all disputed facts are resolved in accord with the plaintiff's view of the facts. Id. at 1320.

Like any deliberate indifference claim, a plaintiff must satisfy both an objective and a subjective inquiry. Chandler v. Crosby, 379 F.3d 1278, 1289-90 (11th Cir. 2004). Under the objective component, a prisoner must prove the condition he complains of is sufficiently serious to violate the Eighth Amendment. Hudson v. McMillian, 503 U.S. 1, 8, 112 S. Ct. 995, 999, 117 L. Ed. 2d 156 (1992). "Specifically, a prisoner must prove a serious medical need or the denial of the minimal civilized measure of life's necessities." Miller v. King, 384 F.3d 1248, 1260-61 (11th Cir. 2004). As for the subjective component, "the prisoner must prove that the prison official acted with '"deliberate indifference."'" Id. (quoting Farmer, 511 U.S. at 837, 114 S. Ct. at 1979). To prove deliberate indifference, the prisoner must show that prison officials '"acted with a sufficiently culpable state of mind'" with regard to the serious prison condition or serious medical need in issue. Id. (quoting Chandler, 379 F.3d at 1289-90). A medical need is serious if it "has been diagnosed by a physician as mandating treatment or [is] one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hill v. DeKalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994) (internal citations omitted). As to the subjective component, the Eleventh Circuit "has consistently held that knowledge of the need for medical care and intentional refusal to provide that care constitute deliberate indifference."

4

Id. at 1186 (citing Mandel v. Doe, 888 F.2d 783, 788 (11th Cir. 1989)).

Defendants assert that the inquiry in this case must focus on whether the seriousness of Buster's condition was "so obvious" that they should have easily recognized the necessity for medical attention. (Doc. No. 45, p. 14.) Defendants contend that it was not obvious that Buster had eaten a Duragesic patch and ingested a lethal dose of narcotics. Defendants aver that they were not informed that Buster had ingested drugs and that Buster denied having taken drugs. In fact, Defendants assert, Buster said he had just woken up and that he had taken one of his prescribed nerve pills. Defendants also assert that Buster appeared to be "coherent and functional" every time they saw him. (Id.) Defendants further assert that they had no reason to believe Buster ate a Duragesic patch, which is designed to be placed on the skin for time-released pain relief. Defendants contend that Buster must have died in his sleep because he was found in the morning in the same position he was in throughout the night. Defendants allege that the cell Buster was in was checked every hour, and there were no indications of problems.

Plaintiff contends that Buster was in custody because his step-father, Pete Spell, went to the Bacon County Jail and informed a deputy that Buster was "strung out" on drugs and that he needed to be taken into custody. (Pl.'s Br., p. 5.) Plaintiff asserts that it was because of this information that Buster was arrested and taken to the jail. Plaintiff also asserts that "everything about [Buster's] demeanor corroborated the information" his step-father relayed to the deputy. (Id.) Plaintiff alleges that Buster's eyes were glassy, his pupils were dilated, he was staggering, he appeared "stoned" or "half wasted", and he

5

attempted to hide a bottle of Xanax pills. (Id.) Plaintiff contends that Defendants are not entitled to summary judgment based on his deliberate indifference claims.

The parties appear to agree on the following facts, based on the evidence before the Court. Buster had taken at least two (2) Duragesic patches from his step-father the day he was arrested and taken to the Bacon County Jail. These patches contained pain medication and were designed to be worn on the skin over a period of seventy-two (72) hours. Buster and his friend Chris Debusk, whom knew Buster had taken drugs in the past, each placed a patch on his skin. The two then pulled the patches off of their skin and began eating the gel contained in the patches. (Debusk Depo., p. 55.) Buster actually swallowed the patch, as a portion of this patch was contained in his stomach according to the autopsy report. Buster's cause of death was "complications of polypharmacy" (Doc. No. 48, Ex. 1), or the effects of the combination of more than one drug. Stedman's Medical Dictionary, p. 657 (1995 ed.). No one seemed to have been aware of anyone eating one of these patches prior to Buster's death.

However, the evidence before the Court also reveals that there are several matters on which the parties do not agree. For instance, Pete Spell stated that he drove to the jail and spoke to Defendant Taylor and "a short, kind of stocky built, low hair cut guy" about getting Buster some help because he had "been drinking or something." (P. Spell Depo., pp. 42-43.) Spell testified during his deposition that he went to the jail to speak to someone after witnessing Buster stagger and slur his words. (P. Spell Depo., p. 42; Doc. No. 48, p. 70.) Spell also testified that he asked Defendant Taylor to check Buster's body for the Duragesic patches at the time Spell went to speak to him at the jail and also five to ten (5-10) minutes after Defendant Taylor left the house with Buster. (P. Spell Depo., p.

6

50.) Spell further testified that, as he was leaving the jail, he asked Taylor to "keep [his] eyes on [Buster] tonight . . . and watch him . . . because he's on– he's on something . . . There's something wrong with him and I don't know what it is. . . [I]f it's the morphine patch . . . I don't know what he done (sic) with them . . . but if that's what it is that he's got in him . . . y'all need to watch him. Keep your eyes on him." (P. Spell Depo., p. 52.) Spell stated that he spoke to four of Buster's fellow detainees after they were released from the jail. According to Spell, these detainees informed him that they beat on the door of the cell, screamed, hollered, and kicked to get the jailer's attention, and the jailer told the detainees to "quieten (sic) down." (P. Spell Depo., p. 75.) Spell stated that the detainees told the jailer that Buster needed help and needed to be checked on because his eyes were red and "rolling back in his head." (Id.) Spell said that the detainees were told to let Buster "lay down" and to "sleep it off." (Id.; P. Spell Depo., pp. 77, 79, and 81.) Spell relayed that he was also informed that the cell Buster was housed in did not have a working light at the time. (P. Spell Depo., p. 77.)

Defendant Taylor was also deposed, and he testified that Pete Spell had spoken to him about Buster being "strung out on pills" and "other drugs" and that Buster had been in detox in the past. (Taylor Depo., pp. 19, 24-25.) Defendant Taylor stated that Pete Spell told him that he (Spell) believed Buster traded the patches for cocaine. (Taylor Depo., p. 24.) Taylor verified that he had stated on a previous occasion that Buster's eyes were glassy and his pupils were dilated or enlarged. (Taylor Depo., p. 25.) Taylor testified that Buster's responses to his questions were "slow" and that he had known Buster for several years. (Taylor Depo., p. 26.) Taylor also testified that it was "apparent" to him "from making a casual observation" of Buster "[t]hat he was under the influence of something.

7

What it was, I didn't know."[1] (Taylor Depo., p. 28.) Taylor further testified that he did not have Buster checked by an Emergency Medical Technician ("EMT") because Buster "didn't appear . . . like he was hurt or he was– anything was going to happen. I mean, he was sober except for just being– you know, things I seen (sic) of him, eyes dilated. Other than that, he walked fine. He talked fine." (Taylor Depo., p. 33.)

Gene Waters, who "dress[ed] Buster out" after he was booked, testified that he found a prescription pill bottle in Buster's name when he searched him. (Waters Depo., p. 7.) Waters stated that Buster walked fine, but his eyes "were a little bloodshot." (Waters Depo., p. 8.) Waters also stated that Buster looked like he was drunk, as he could tell Buster had been drinking. (Waters Depo., pp. 9-10.) Waters testified that he suggested to Shane Burkett that Buster should be placed in a holding cell for observation. Waters also testified that he "probably would have" placed Buster in a holding cell if he had any control over where to place detainees. (Waters Depo., p. 17.) At the Coroner's Inquest, Waters testified that Buster's eyes were not "glassy, but when he was trying to change clothes, he would stagger a little bit. And I said something to him like, 'You're almost wasted; ain't you?' He said, 'No, I just woke up– hadn't been long woke up (sic).'" (Doc. No. 48, p. 129.) Waters did not think Buster was in a condition to warrant a visit to a doctor or hospital because Buster "was laughing and joking", Waters could understand Buster when he spoke, and Buster "knew where he was." (Id.)

---

[1] This testimony echoes testimony Taylor provided at the Coroner's Inquest. During the Inquest, Taylor stated that Buster did not seem to be incoherent, but "[h]e may have been under the influence, but he didn't act like he was that bad." (Doc. No. 48, p. 98.)

8

Sheila Soto was one of the jailers working at the Bacon County Jail on the night Buster was arrested. In the transcript of her interview with Special Agent Trent Hillsman, it states that Soto spoke with Buster and "could tell that he was 'stoned,' but he seemed to be coherent." (Att. to Doc. No. 52, p. 2.) Soto had a conversation with Buster, and Soto thought Buster understood the conversation. (Att. to Doc. No. 52, p. 3.)

Horace Wallace was detained at the Bacon County Jail at the time Buster was there. According to Wallace, Buster was not able to walk alone and his eyes "were barely opened and like rolling behind his head." (Doc. No. 48, p. 145.) Wallace stated that he did not think Buster should have been brought back to the general population area of the jail and that he and the other inmates tried to get help for Buster when he was first brought back to where they were. (Doc. No. 48, p. 150.) Wallace also stated that, although Buster was talking "fine", he was "kind of like talking out of his head" and did not really know what he was doing. (Doc. No. 48, p. 147.) Wallace stated that "[e]verybody told [the jailers] that [Buster] needed help", and that the inmates could bang on the door to garner the jailers' attention only "so much without getting into trouble." (Doc. No. 48, p. 149.) Wallace said that he was in the cell with Buster after lock down occurred and that there was no light in the cell. Wallace also said that the inmates heard Buster that night and thought he was breathing, but "he must have been gasping for breath." (Doc. No. 48, p. 151.)

Thomas Hasty was also being housed at the Bacon County Jail on the night in question. Hasty testified at the Coroner's Inquest that Buster was not able to walk alone. Hasty also testified that he told the jailer that it did not look like Buster needed to be in the general population area but in a "drunk tank." (Doc. No. 48, p. 158.) Hasty also testified that he asked Buster if he needed any help and that Buster told him that he told the jailer

9

he needed help. Hasty echoed Wallace's testimony that he knocked on the door to get some help, but he could not do that for long without getting into trouble, and that there was no light in the cell Buster was in that night. (Doc. No. 48, pp. 159-60.)

Donell Stevens, another inmate at the Bacon County Jail, testified that Buster was staggering and that an inmate had to help him walk. Stevens testified that Buster kept closing his eyes and when he spoke, he was "dragging." (Doc. No. 48, p. 170.) Stevens also testified that, after lockdown time that night, no jailer came to this area of the jail.

Christy Spell, Buster's mother, testified during her deposition that Sheila Soto, with whom she worked in the past, called her after Buster arrived at the jail. According to Spell, Soto told her that Buster "was high." (C. Spell Depo., p. 63.) Spell stated that she told Soto that Buster had "a problem", and that Soto told her, "I know, I can see that." (C. Spell Depo., p. 64; Doc. No. 48, p. 80.)

In addition, Jack Burnette, Buster's uncle, testified during the Coroner's Inquest that he overheard a conversation between the sheriff and a staff member. According to Burnette, the staff member told the sheriff that he knew Buster was incoherent and that his eyes were "glassed over" when he was brought to the jail. (Doc. No. 48, p. 171.) Burnette stated that he also heard the sheriff tell the staff member, "Well, we don't want to tell the investigator that." (Doc. No. 48, p. 175; Doc. No. 48, Ex. 4.) Sheriff Richard Foskey testified during his deposition that this was not the conversation he and Defendant Taylor had and that "Jack Burnette wrote down what he wanted to write down." (Foskey Depo., p. 16.)

Defendant Batton helped Defendant Taylor arrest Buster on the night in question. According to Batton, he could not tell if Buster's eyes were glassy that day because he did

not look at his eyes. Batton testified that Buster "appeared normal" and that he had known Buster for several years prior to this arrest. (Batton Depo., pp. 12, 15.) Batton stated during the Coroner's Inquest that he did not feel that Buster needed any medical assistance and did not look like he was incoherent or drugged; rather, Batton thought "he looked like Buster" to him. (Doc. No. 48, p. 123.)

Defendant Johnston was working at the Bacon County Jail on the night Buster was arrested. Johnston stated Buster was not "staggering, slurred speech, nothing like that." (Johnston Depo., p. 12.) Johnston stated that he did not agree with Waters' testimony that Buster appeared to be drunk. (Johnston Depo., p. 13.) Johnston thought Buster was not intoxicated or incoherent and that his eyes were not "glassed over." (Doc. No. 48, p. 133.) Johnston stated that Waters did not suggest to him that Buster should be in the holding cell for observation and that Buster actually wanted to go to the general population area, even though Buster's desire did not control where he was placed. However, Johnston noted that Buster "had no problem functioning." (Johnston Depo., p. 16.) Johnston testified that he performed security checks every hour and that he noticed that Buster and the other inmates "were laughing and talking" at one check. (Johnston Depo., p. 20.) After lockdown that night, he did a head count at every hour, which consisted of opening the tray flap, looking into the cell, and counting bodies. (Johnston Depo., p. 23.) Johnston testified that there are "big florescent lights in the cell and the light floods in there. You can see in there." (Id.)

There appear to be genuine issues of material fact as to whether Defendants were deliberately indifferent to any serious medical needs Buster may have had prior to his death; the record, which the undersigned did not exhaustively note the examples of, is

11

replete with conflicting evidence. The undersigned recognizes that the Defendants could not have reasonably known that Buster had eaten the Duragesic patch which contributed to his death. However, it should be for a jury's determination whether, *inter alia*,: Buster exhibited signs of intoxication or being under the influence of an intoxicant; Defendants knew or should have known that Buster needed medical attention; the cell in which Buster died was not illuminated such that Defendant Johnston could not see into the cell; or fellow inmates tried to obtain help for Buster before he died. Defendants are not entitled to summary judgment on this claim.

## II.     Defendants are not Entitled to Summary Judgment Based on Qualified Immunity.

Defendants contend that even if Plaintiff could demonstrate a violation of Buster's constitutional rights, his claims are barred by qualified immunity. Defendants assert that the circumstances in this case do not support the finding of a constitutional violation which was obvious or which would have provided fair notice to an objectively reasonable deputy or correctional officer in the same or similar circumstances.

Qualified immunity protects government officials performing discretionary functions from suit in their individual capacities, so long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Gonzalez v. Reno, 325 F.3d 1228, 1232 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515, 153 L. Ed. 2d 666 (2002)). A government official must first prove that he was acting within his discretionary authority. Id. at 1233; Ray v. Foltz, 370 F.3d 1079, 1081-82 (11th Cir. 2004). A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that

12

challenged actions occurred in the performance of the official's duties and within the scope of this authority. Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1303 (11th Cir. 2006). Once the government official has shown he was acting within his discretionary authority, the burden shifts to the Plaintiff to show that the Defendant is not entitled to qualified immunity. The Supreme Court has established a two-part test to determine the applicability of qualified immunity: First, the court must determine whether plaintiff's allegations, if true, establish a constitutional violation. Hope, 536 U.S. at 736, 122 S. Ct. at 2513. If, under the plaintiff's allegations, the defendants would have violated a constitutional right, then "the next, sequential step is to ask whether the right was clearly established." Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001); Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004).

It appears clear that Defendants were performing discretionary functions of their jobs in booking and housing Buster. As discussed in the preceding section, however, genuine issues of material fact exists as to whether Defendants were deliberately indifferent to a serious medical need Buster may have had. It was clearly established law at the time of this incident that prison officials are not to be deliberately indifferent to the serious medical needs of inmates. Defendants are not entitled to summary judgment based on qualified immunity.

### III. Defendants are Entitled to Summary Judgment in Their Official Capacities.

Defendants assert that there is no evidence of a policy or custom of Bacon County which caused the alleged violation of Buster's constitutional rights. Defendants also assert that Plaintiff cannot show that any alleged policy or custom was the "moving force behind the constitutional violation." (Doc. No. 45, p. 21.) Defendants allege that Plaintiff can

AO 72A
(Rev. 8/82)

present no evidence that the County lacked proper procedures or staff for screening, monitoring, or otherwise tending to the medical needs of detainees.

Plaintiff asserts that Sheriff Foskey testified during his deposition that the policy of the jail is that any person requiring medical attention be delivered to the appropriate medical facility. Plaintiff also asserts that each of the Defendants testified during his deposition that he had no knowledge or training in determining whether a person needed medical attention due to drug intoxication. Plaintiff avers that, had a policy been in place under the circumstances in this case, Buster would not have died.

A governmental entity "may be held liable for the actions of" its employees when the entity's "official policy causes a constitutional violation." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998). A plaintiff "must identify a . . . policy or custom [which] caused his injury." Id. A governmental entity is subject to liability under section 1983 "when execution of a government's policy or custom . . . inflicts the injury." Mercado v. City of Orlando, 407 F.3d 1152, 1161 (11th Cir. 2005).

The evidence before the Court does not support a finding that Bacon County had a policy or custom in place which caused Buster's injuries. At best, Plaintiff points to Sheriff Foskey's deposition testimony that there was a procedure in place that, if an arrestee had a visible medical problem, he was to be taken to a medical facility for treatment prior to being taken to the Bacon County Jail. (Foskey Depo., pp. 17-18.) The evidence suggests that there may have been a procedure in place on how to handle individuals in need of medical treatment which may or may not have been followed by Defendants. This is insufficient, as a matter of law, to establish the existence of a policy or custom which led to the alleged constitutional violations in order for Bacon County to be

14

held liable in this case. Plaintiff's claims against Defendants in their official capacities should be dismissed.

## CONCLUSION

Based on the foregoing, it is my **RECOMMENDATION** that the Motion for Summary Judgment filed by Defendants Taylor, Batton, Waters, and Johnston (Doc. No. 44) be **GRANTED**, in part, and **DENIED**, in part. Plaintiff's claims against Defendants in their official capacities should be **dismissed**. The remainder of Plaintiff's claims should remain pending.

**SO REPORTED** and **RECOMMENDED**, this 6th day of January, 2007.

JAMES E. GRAHAM
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev. 8/82)